Stacy **HEINZELMAN,** Petitioner,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,** Respondent.

No. 07–01 V.

United States Court of Federal Claims.

June 24, 2011.

Richard Gage, Richard Gage, P.C., Cheyenne, Wyoming, for Petitioner.

Ryan D. Pyles, Trial Attorney, Torts Branch, Civil Division, United States Depart-

ment of Justice, Washington, D.C., for Respondent.

## OPINION

EDWARD J. DAMICH, Judge.

Respondent filed a motion for review on January 6, 2011, of the Special Master's Decision Awarding Damages dated December 7, 2010. Compensation in this case was awarded pursuant to the National Child Vaccine Injury Compensation Act of 1986, 42 U.S.C. § 300aa-1 *et seq.* (2006) ("Vaccine Act"). The Special Master's decision incorporated two previous rulings including the Special Master's Ruling Granting Compensation, issued December 11, 2008, and Ruling Regarding Offset, issued May 18, 2010. In his Ruling Granting Compensation, the Special Master found that Petitioner had proven that the flu vaccination she received was the cause-in-fact of her Guillain–Barré syndrome ("GBS") and that Respondent had failed to refute Petitioner's prima facie case for causation. Additionally, the Special Master found that Respondent had failed to prove its prima facie case for alternative causation. Respondent claims that the Special Master erred by failing to consider the record as a whole before determining whether Petitioner made a prima facie case and, therefore, prematurely shifted the burden of proof to Respondent. In his Ruling Regarding Offset, the Special Master determined that Petitioner's anticipated Social Security Disability Insurance ("SSDI") payments should not reduce the compensation to which Petitioner would otherwise be entitled under the Vaccine Act. Respondent claims that the Special Master erred in not offsetting Petitioner's SSDI payments because such payments should be relevant when determining "actual or anticipated loss of earnings" pursuant to 42 U.S.C. § 300aa-15(a)(3)(A).

For the reasons set forth below, the Court DENIES Respondent's motion for review.

## I. Facts

The facts of this case are not in material dispute. Petitioner Stacey Heinzelman was born in 1971. On December 10, 2003, Ms. Heinzelman received a flu vaccination. On approximately December 19, 2003, Ms. Heinzelman began to show signs of a gastrointestinal ("GI") illness. The pathogen responsible for this illness, however, was never identified. On December 30, 2003, Ms. Heinzelman saw her primary care doctor and complained that she had a headache, tingling in her hands and feet, and stiff legs. On December 31, 2003, Ms. Heinzelman was admitted to the hospital and diagnosed as having GBS. GBS is "an acute, immune-mediate disorder of peripheral nerves, spinal roots, and cranial nerves, commonly presenting as a rapidly progressive, areflexive, relatively symmetric ascending weakness of the limb, truncal, respiratory, pharyngeal, and facial musculature, with variable sensory and autonomic dysfunction." Stedman's Medical Dictionary 1899 (28th ed. 2006). Neither the expert for petitioner nor the expert for Respondent disputes the GBS diagnosis. Both parties agree that Ms. Heinzelman will never again be gainfully employed. Ms. Heinzelman's pre-vaccination gross earning capacity was approximately $50,000 per year. Ms. Heinzelman is also eligible to receive SSDI payments of approximately $20,000 per year due to her GBS.

## II. Procedural History

On January 3, 2007, Petitioner filed a petition seeking compensation under the Vaccine Act alleging that the flu vaccine she received on December 10, 2003, caused her to develop GBS. Following a hearing on April 28, 2008, where each side presented expert testimony, as well as subsequent briefing by the parties, on December 11, 2008, the Special Master issued a Ruling Granting Compensation to Petitioner. During the damages phase of the proceedings, Respondent and Petitioner disagreed over whether Petitioner's compensation award should be offset by the amount Petitioner was expected to receive in SSDI payments as the result of her vaccine-caused injury. On May 18, 2010, the Special Master ruled that Petitioner's SSDI payments should not reduce the compensation to which Petitioner would otherwise be entitled under the Vaccine Act. On December 7, 2010, the Special Master directed the entry of final judgment which was based upon Respon-

dent's Proffer on Award of Compensation, in which Respondent stated that the determination of an award of lost earnings was made in accordance with the Special Master's May 18, 2010, Ruling Regarding Offset over Respondent's continued objection. Respondent filed a motion for review on January 6, 2011.

## III. Statutory Framework of the Vaccine Act

 The Vaccine Act provides a system of compensating individuals who claim to have been injured by certain vaccines. As part of a petitioner's burden of proof, the Act provides two ways for a petitioner to satisfy his or her prima facie case of causation. In an "on-Table case," a petitioner is entitled to a presumption of causation if the petitioner can prove that he or she received a vaccination listed in the Vaccine Injury Table ("Table"), 42 U.S.C. § 300aa–14, and suffered an injury listed in the Table within the prescribed time period. 42 U.S.C. § 300aa–11(c)(1)(C)(i); *see also Walther v. Sec'y of HHS*, 485 F.3d 1146, 1149 (Fed.Cir.2007). At that point, the burden shifts to the respondent to prove that a "factor unrelated" to the vaccination actually caused the injury. 42 U.S.C. § 300aa–13(a)(1)(A), (B); *see also Pafford v. Sec'y of HHS*, 451 F.3d 1352, 1355 (Fed.Cir.2006). However, if an injury was either not listed in the Table or occurred outside of the Table's prescribed time period, then the case is "off-Table" and the petitioner is not entitled to a presumption of causation. *See Pafford*, 451 F.3d at 1355. In an "off-Table case," a petitioner must prove that he or she received the vaccine listed in the Table and that he or she suffered an injury that was actually caused by the vaccine. 42 U.S.C. § 300aa–11(c)(1)(C)(ii); *see also Walther*, 485 F.3d at 1149. Ms. Heinzelman does not allege she suffered a table injury. Therefore, Ms. Heinzelman must prove causation-in-fact. *See Grant v. Sec'y of HHS*, 956 F.2d 1144, 1147–48 (Fed.Cir.1992).

 The Federal Circuit has held that causation-in-fact in the Vaccine Act context is the same as "legal cause" in the general torts context. *See, e.g., de Bazan v. Sec'y of HHS*, 539 F.3d 1347, 1351 (Fed.Cir.2008) (citing *Shyface v. Sec'y of HHS*, 165 F.3d 1344, 1352

(Fed.Cir.1999)). To prove causation in a case brought under the Vaccine Act, a petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface*, 165 F.3d at 1352–53. The petitioner need *not* show that the vaccine was the sole or predominant cause of his or her injury, just that it was a substantial factor. *See, e.g., de Bazan*, 539 F.3d at 1351; *Walther*, 485 F.3d at 1150. Accordingly, in order to prove causation-in-fact, a petitioner must establish by a preponderance of the evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of HHS*, 418 F.3d 1274, 1278 (Fed.Cir.2005). Once a petitioner has met his or her burden to prove causation-in-fact, and thus establish a prima facie case for entitlement to compensation, the burden then shifts to the government to prove "[by] a preponderance of the evidence that the [petitioner's injury] is due to factors unrelated to the administration of the vaccine described in the petition." 42 U.S.C. § 300aa–13(a)(1)(B); *see also de Bazan*, 539 F.3d at 1352; *Walther*, 485 F.3d at 1149–50.

## IV. Standard of Review

 Pursuant to 42 U.S.C. § 300aa–12(e)(2)(B), this Court must uphold any findings of fact or conclusions of law of the Special Master unless the findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). With respect to findings of fact, the Special Master has broad discretion to weigh expert evidence and make factual determinations. *See, e.g., Bradley v. Sec'y of HHS*, 991 F.2d 1570, 1575 (Fed.Cir.1993). "If the special master has considered the relevant evidence of the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of HHS*, 940 F.2d 1518, 1528 (Fed.Cir.1991). This Court ought not to second-guess the Special Master's

fact-intensive conclusions, particularly in cases "in which the medical evidence of causation is in dispute." *Hodges v. Sec'y of HHS*, 9 F.3d 958, 961 (Fed.Cir.1993). With respect to questions of law, legal rulings are reviewed *de novo* under the "not in accordance with law" standard. *See, e.g., Moberly v. Sec'y of HHS*, 592 F.3d 1315, 1321 (Fed. Cir.2010); *Munn v. Sec'y of HHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992).

Respondent's first argument that the Special Master failed to consider the record as a whole is a mixed question of law and fact. The allocation of the burdens of proof under the Vaccine Act is a legal issue subject to *de novo* review. However, Respondent's claim that the Special Master did not give enough weight to Respondent's evidence is a question of fact and the Court will defer to the Special Master's factual determinations so long as they are not arbitrary and capricious. Respondent's second argument concerning whether Petitioner's Social Security Disability Insurance ("SSDI") payments are relevant in determining Petitioner's compensation under the Vaccine Act is a legal issue and is therefore subject to *de novo* review.

### V. The Special Master Considered the Record as a Whole and Properly Allocated the Burdens of Proof in Accordance with the Vaccine Act

■ Respondent claims that the Special Master erred by failing to consider the record as a whole before determining whether Petitioner made a prima face case that the flu vaccine was the actual cause of her GBS, and therefore prematurely shifted the burden to Respondent to prove alternative causation. Specifically, Respondent argues that there was insufficient evidence for Petitioner to establish her prima facie case of causation-in-fact and that the Special Master did not give enough weight to Respondent's expert witness's testimony that Petitioner's GBS was statistically more likely caused by her GI illness. Resp't Mot. for Review at 4–5 ("[T]he Special Master has the obligation to consider the record as a whole and should have considered the evidence of a GI illness together with the vaccine when considering [P]etitioner's prima facie case of causation.").

Petitioner argues that the Special Master did consider the record as a whole and correctly found that there was sufficient evidence to establish her prima facie case of actual causation. Therefore, argues Petitioner, the Special Master properly shifted the burden to Respondent to prove alternative causation. Petitioner then argues that the Special Master was correct in finding that Respondent had not met its burden to prove that the GI illness was the cause of Petitioner's GBS because Respondent's "factors-unrelated" evidence was predominantly statistical evidence.

The Court holds that the Special Master properly considered the record as a whole when evaluating Petitioner's prima facie case as required by the Vaccine Act. The Court also holds that the Special Master's finding that Petitioner met her burden to prove actual causation by preponderant evidence was not arbitrary or capricious.

■ In order for a petitioner to prove his or her prima facie case of causation-in-fact, a petitioner must satisfy the three-prong test prescribed in *Althen* of establishing by a preponderance of the evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. Respondent does not dispute that Petitioner has satisfied the first and third prongs of the *Althen* test since Respondent's expert witness conceded that flu vaccine has been implicated in the onset of GBS and that the twenty days between the administration of the vaccine and the onset of Petitioner's GBS was a sufficient temporal relationship. Tr. at 56, 63. This case centers on the second prong of *Althen*. The Federal Circuit has held that " '[a] logical sequence of cause and effect' means what it sounds like—the claimant's theory of cause and effect must be logical." *Capizzano v. Sec'y of HHS*, 440 F.3d 1317, 1325 (Fed.Cir. 2006). "A petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case...." *Moberly*, 592 F.3d at 1322. For its part,

"[t]he government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the petitioner's evidence on a requisite element of the petitioner's case in chief." *de Bazan*, 539 F.3d at 1353; *see also Doe 11 v. Sec'y of HHS*, 601 F.3d 1349, 1358 (Fed.Cir.2010). However, a petitioner's explanation need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of HHS*, 35 F.3d 543, 548–49 (Fed. Cir.1994); *see also Moberly*, 592 F.3d at 1322. "Scientific certainty" is not the standard of proof. *See Bunting v. Sec'y of HHS*, 931 F.2d 867, 873 (Fed.Cir.1991).

As Respondent readily admits, whether Petitioner proved by a preponderance of the evidence that the flu vaccine was the cause of her GBS is the "core question at the heart of this case." Resp't Mot. for Review at 6. In its Motion for Review, Respondent asserts that the Special Master answered this question in the negative. *Id.* Respondent is incorrect. After considering the testimony of Petitioner's expert witness, Dr. Marcel Kinsbourne, the Special Master explicitly held that "Ms. Heinzelman has established, by a preponderance of the evidence, each of the prongs required by *Althen.*" Special Master Ruling Granting Compensation at 21, 7–8. A trained neurologist, Dr. Kinsbourne testified that in his opinion, at a level of reasonable medical probability, Ms. Heinzelman's GBS was caused by the flu vaccine she received on December 10, 2003. Tr. at 6. As part of his testimony, Dr. Kinsbourne cited to several medical articles containing empirical studies and medical commentaries to support his diagnosis. Tr. 7–12. Dr. Darryl Prince, the neurologist who treated Ms. Heinzelman, also agrees with Dr. Kinsbourne's diagnosis. Special Master Ruling Granting Compensation at 8, n. 3. Petitioner has therefore provided a reputable medical explanation for her GBS as required by the second prong of *Althen.* Moreover, according to the Federal Circuit in *Capizzano*, evidence used to satisfy one of the *Althen* prongs may overlap with and be used to satisfy another prong. *Capizzano*, 440 F.3d at 1326. "In other words, if close temporal proximity, combined with the finding that [a certain vaccine] can cause [a certain injury], demonstrates that it is logical to conclude that the vaccine was the cause of [that injury], then medical opinions to [that] effect are quite probative." *Id.* In fact, the government in *Capizzano* conceded that medical opinions and records alone could be enough to satisfy the second prong of *Althen.* *Id.* at 1325.

Respondent makes much of the fact that Dr. Kinsbourne ruled out Petitioner's GI illness as the cause of her GBS simply because the pathogen causing the GI illness was never identified. However, Respondent's claim that Dr. Kinsbourne offered no scientific rationale for his conclusion is incorrect, as is Respondent's claim that the Special Master engaged in no analysis to determine the reliability of Dr. Kinsbourne's medical conclusion. Dr. Kinsbourne testified that positing GI illness as an alternative cause of Ms. Heinzelman's GBS would be manufacturing a diagnosis out of nothing because the pathogen causing her GI illness was never identified. Tr. at 32. While is it true that there are many infectious organisms (both viral and bacterial) that can cause both GI illness and GBS, Dr. Kinsbourne's testimony implied that there were other infectious agents that can cause GI illness and not contribute to an onset of GBS. Tr. at 31. No clinical tests were ever done on Ms. Heinzelman to determine what pathogen caused her GI illness and Dr. Kinsbourne testified that there is nothing about the clinical features of the GI illness which can enable one to tell which pathogen was responsible. Tr. at 14. Respondent's argument that "a viral infection' can be an alternative causation, even though the viral infection is not in the particular case specifically identified by type or name" is correct. *Knudsen*, 35 F.3d at 549. However, "the government may defeat a petitioner's claim with a theory of viral infection *so long as* it proves that there was in fact a viral infection, and that the viral infection 'in the particular case [was] ... principally responsible for *causing* the petitioner's illness, disability, injury, or death.'" *Id.* (citing 42 U.S.C. § 300aa–13(a)(2)) (emphasis added). As will be explained in greater detail below, Respondent has failed to demonstrate that there even *was* a viral or bacterial infection linked to Petitioner's GBS, let alone a viral or

bacterial infection that actually caused Petitioner's GBS. It is unreasonable for Respondent to expect Petitioner's expert witness to scientifically rule out a theory so conjectural and vague to begin with. Unlike Respondent, Petitioner *can* point to a specific agent (the flu vaccine) as the cause of her GBS and can demonstrate that the agent was actually present in her system before the onset of her GBS.

■ Respondent's claim that the Special Master did not even consider Respondent's evidence when evaluating Petitioner's prima facie case is incorrect. The Special Master admitted and weighed both parties' evidence but simply decided that Petitioner's evidence was persuasive enough to make out a prima facie case and to withstand Respondent's rebutting evidence. Respondent's argument that the Special Master did not afford its expert witness's testimony enough weight in evaluating Petitioner's prima facie case is essentially a rehashing of the evidence presented at the hearing on April 28, 2008. With respect to findings of fact, the Federal Circuit has held that the Special Master has broad discretion to weigh expert evidence and make factual determinations. *See, e.g., Bradley,* 991 F.2d at 1575. Factual determinations are reviewed under the "arbitrary and capricious" standard, and "[i]f the [S]pecial [M]aster has considered the relevant evidence of the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines,* 940 F.2d at 1528. Moreover, in regard to expert testimony, "[a]ssessments as to the reliability of expert testimony often turn on credibility determinations, particularly in cases ... where there is little supporting evidence for the expert's opinion." *Moberly,* 592 F.3d at 1325–26. As the finder of fact in Vaccine Act cases, special masters are "entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." *Id.* at 1326. In this case, the Court cannot say that the special master's careful weighing of the conflicting evidence presented by each side's expert was "so clearly wrong as to be arbitrary or capricious." *Lampe v. Sec'y of HHS,* 219 F.3d 1357, 1361–62 (Fed.Cir.2000).

Having held that the Special Master did not act arbitrarily or capriciously in finding that Petitioner established her prima facie case, the Court also holds that the Special Master correctly allocated the burdens of proof. As the Federal Circuit has repeatedly held, once a petitioner has established a prima facie case for entitlement to compensation, and thus has met the burden to prove causation-in-fact, the burden shifts to the government to prove that factors unrelated to the vaccination actually caused the illness, disability, injury, or condition. *See, e.g., Doe 11,* 601 F.3d at 1357; *Broekelschen v. Sec'y of HHS,* 618 F.3d 1339, 1342 (Fed.Cir.2010); *de Bazan,* 539 F.3d at 1352; *Walther,* 485 F.3d at 1150; *Pafford,* 451 F.3d at 1355; *Althen,* 418 F.3d at 1278 (Fed.Cir.2005); *Knudsen,* 35 F.3d at 547. While the burden of proving a prima facie case is on the petitioner, the government then has the burden of showing the injury was caused by a "factor unrelated." *See, e.g., de Bazan,* 539 F.3d at 1352; *Walther,* 485 F.3d at 1150. "A plain reading of the statutory text [of the Vaccine Act] more naturally places the burden on the government to establish that there is an alternative cause by a preponderance of the evidence." *Walther,* 485 F.3d at 1150. A petitioner does not bear the burden to disprove his or her own case. "Indeed, placing the alternative causation burden on the petitioner would essentially write § 300aa–13(a)(1)(B) out of the [Vaccine Act]." *Id.* Accordingly, "when there are multiple independent causes, the government has the burden to prove that the covered vaccine did not cause the harm." *Id.* at 1151.

In this case, the Special Master did not err in holding that the Respondent did not meet its burden of proof in establishing Petitioner's GI illness as the cause of her GBS because Respondent's evidence was predominantly statistical analysis. As the Special Master correctly noted, the Federal Circuit has rejected the use of bare statistical probabilities to determine whether a vaccine or some other factor caused an adverse reaction. Special Master Ruling Granting Compensation at 22 (citing *Knudsen,* 35 F.3d at

550). In *Knudsen,* the Federal Circuit held that:

> The bare statistical fact that there are more reported cases of viral encephalopathies than there are reported cases of DTP encephalopathies is *not* evidence that in a particular case an encephalopathy following a DTP vaccination was in fact caused by a viral infection present in the child and not caused by the DTP vaccine.

*Knudsen,* 35 F.3d at 550. Similarly, Respondent's evidence in this case amounted only to bare statistical analysis showing that Petitioner's GBS was more likely caused by GI illness than flu vaccine. The Court rejects the government's argument that *Knudsen* is distinguishable as an "on-Table case" and that statistical probabilities are only insufficient to undo a legally-presumed causation. Once a petitioner has proven causation-in fact in an "off-Table case," that petitioner is on the same legal footing as a petitioner in an "on-Table case" who has proven that he or she received a vaccine listed on the Table and suffered an injury listed on the Table within the prescribed time period. *See Walther* 485 F.3d at 1150 ("The [Vaccine Act] provides two ways for a petitioner to satisfy his or her prima facie case of causation."). In this case, there is no evidence that the Special Master's finding that Respondent failed to prove alternative causation was arbitrary or capricious.

## VI. Petitioner's Compensation Under the Vaccine Act Should Not Be Reduced by the Amount of Benefits She May Receive Through Social Security Disability Insurance (SSDI)

In determining whether SSDI benefits should reduce the amount of Petitioner's compensation authorized by the Vaccine Act, two issues must be addressed: (1) whether Petitioner's anticipated SSDI payments should be considered when determining her "actual and anticipated loss of earnings," 42 U.S.C. § 300aa–15(a)(3)(A), and (2) whether SSDI should be considered a "Federal … health benefits program," and therefore offset any compensation granted under the Vaccine Act. *Id.* § 300aa–15(g).

Compensation under the Vaccine Act is governed by 42 U.S.C. § 300aa–15, which states:

> In the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections.

*Id.* § 300aa–15(a)(3)(A). However,

> Payment of compensation under the [Vaccine Act] shall not be made for any item or service to the extent that payment has been made, or can reasonably be expected to be made, with respect to such item or service (1) under any State compensation program, under an insurance policy, or under any Federal or State health benefits program (other than title XIX of the Social Security Act [Medicaid] [42 U.S.C. 1396 et seq.]), or (2) by an entity which provides health services on a prepaid basis.

*Id.* § 300aa–15(g).

In this case, the Special Master ruled that Petitioner's SSDI payments should not reduce Petitioner's "loss of earnings" compensation under section 15(a)(3)(A). Specifically, the Special Master ruled that section 15(a) should be seen as "giving" compensation, while section 15(g) reduces what could be awarded under section 15(a). Special Master Ruling Regarding Offset at 5. In other words, according to the Special Master, section 15(g) "takes away" compensation that is "given" in section 15(a). *Id.*

Respondent argues that this statutory interpretation is in error. First, Respondent argues that Petitioner cannot be said to have "actual or anticipated loss of earnings" for the amount that SSDI pays because those payments already compensate a portion of her projected loss of earnings. According to Respondent, not reducing Petitioner's compensation by the amount she receives in SSDI payments would result in an inappropriate "windfall" for Petitioner. Second, Respondent argues that SSDI is a "Federal … health benefits program" and should there-

fore offset Petitioner's compensation award pursuant section 15(g). Lastly, Respondent argues that since the Vaccine Act is a waiver of sovereign immunity and "loss of earnings" and "Federal ... health benefits program" are both ambiguous terms, then principles of sovereign immunity require that such terms be narrowly construed in favor of the government.

Petitioner argues that the Special Master correctly interpreted 42 U.S.C. § 300aa–15 and that section 15(a) is not the portion of the statute that deals with offsets—or that "takes away" compensation. Moreover, Petitioner argues that the plain language of section 15(g) proves that SSDI is not a "Federal ... health benefits program" as contemplated by Congress. Specifically, Respondent argues that if Congress intended for SSDI payments to be offset, then Congress would have so indicated when it specifically enumerated the types of funding sources that were to be considered offsets in section 15(g).

Statutory interpretation begins with the plain meaning of the language of the statute. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 547, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) ("The starting point in any case involving construction of a statute is the language itself."). If "the language is clear and fits the case, the plain meaning of the statute will be regarded as conclusive." *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed.Cir.2004). "When the language of the statute is not clear, canons of construction may be used to determine the meaning of the statute, if possible." *Cherokee Nation of Okla. v. United States*, 73 Fed.Cl. 467, 476 (2006). One such fundamental canon of statutory construction is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). Additionally, if the statutory language is unclear, the Court will look to the legislative history of the statute. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Allen v. Principi*, 237 F.3d 1368, 1375 (Fed.Cir.2001).

### A. Section 15(a)(3)(A)

■ "Loss of earnings" is not explicitly defined in the statute. However, Black's Law Dictionary sheds light on the plain meaning of "earnings." Specifically, Black's Law Dictionary defines "earnings" as "[r]evenue gained from labor or services, from the investment of capital, or from assets." Black's Law Dictionary 548 (9th ed. 2009). Accordingly, section 15(a)(3)(A) should be read to authorize a damages recovery when, due to a vaccine injury, a person has lost the ability to earn revenue from his or her labor or other services, etc. The damages may be actual earnings lost, from a retrospective view, as well as earnings anticipated to be lost, if the loss of revenue will continue in the future. The starting point for the calculation, therefore, is the amount of earnings during the past, present, and/or future loss periods.

Respondent would effectively interpose an offset at this point by subtracting SSDI payments from the injured person's compensation, on the reasoning that SSDI is already a partial compensation for the injured person's loss of earnings. According to Respondent, "There is no loss of that income to the extent that SSDI, awarded due to the vaccine-related injury, substitutes for that income." Mot. for Rev. at 19. In construing section 15(a)(3)(A), Respondent, however, conflates the interaction of sections 15(a)(3)(A) and 15(g). The focus of the former section is to establish a baseline for compensation: earnings not earned because of the vaccine injury. Respondent's interpretation of the phrase, "compensation for actual and anticipated loss of earnings," in section 15(a)(3)(A), would change its effective meaning to "compensation for actual and anticipated loss of earnings *not otherwise compensated.*" The latter meaning, however, at least to a limited extent, is the point of section 15(g). SSDI payments are not encompassed under the definition of "earnings" cited above. The calculation of "lost" earnings, as to which section 15(a)(3)(A) of the Vaccine Act authorizes compensation, is, therefore, by definition, independent of SSDI payments. SSDI provides a degree of mitigation of lost earnings, but does not change the calculation thereof.

Moreover, the legislative history of the Vaccine Act indicates that Congress did not intend for Petitioner's potential SSDI payments to be considered when determining Petitioner's "loss of earnings" compensation. For instance, the House Report for the Committee on Energy and Commerce states that "[t]he Committee [did] not intend that [an] award be reduced because of other government benefits for which the injured person might be eligible." H.R.Rep. No. 99–908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6362. Accordingly, the Court holds that Petitioner's SSDI benefits should not be considered in the first instance when determining Petitioner's "loss of earnings" compensation under section 15(a)(3)(A).

**B. Section 15(g)**

■ Since the Court holds that Petitioner's SSDI should not reduce her "loss of earnings" compensation under section 15(a), the Court must now determine whether SSDI constitutes a "Federal ... health benefits program" under section 15(g), and therefore an offset to the compensation granted to Petitioner under section 15(a). Respondent argues that SSDI is a "Federal ... health benefits program" because SSDI requires a determination of physical disability before an applicant is qualified to receive benefits. Additionally, Respondent argues that since Title XIX of the Social Security Act is specifically exempted from the offset provision of section 15(g), then *other* titles of the Social Security Act, including SSDI, are *not* exempt and should, therefore, be considered "Federal ... health benefits program" offsets. The Court does not agree with Respondent's arguments. First, SSDI is not a "Federal ... health benefits program" simply because it requires an applicant to have a physical disability. Unlike Medicare or the Children's Health Insurance Program, SSDI does not provide applicants with health insurance benefits. Rather, SSDI compensates an applicant for his or her loss of income since the applicant is disabled and no longer able to work. SSDI does not necessarily pay for an applicant's medical expenses. Second, there are many provisions of the Social Security Act that have nothing to do with health benefits. *See, e.g.,* 42 U.S.C. § 401 *et seq.* (retirement benefits); 42 U.S.C. § 601 *et seq.* (Temporary Assistance for Needy Families); 42 U.S.C. § 1101 *et seq.* (unemployment benefits). Just because section 15(g) exempts one Title of the Social Security Act[1] does not mean that all other Titles should be considered "Federal ... health benefits program" offsets. Accordingly, the Court holds that SSDI does not constitute a "Federal ... health benefits program" and, therefore, Petitioner's SSDI payments should not offset the compensation she was granted under section 15(a).[2]

**VII. Conclusion**

The Court holds that the Special Master did not act arbitrarily or capriciously when considering the record as a whole and properly allocated the burdens of proof. The Court also holds that the Special Master did not err by not reducing Petitioner's award by the amount Petitioner would receive in SSDI payments. Respondent's Motion for Review is DENIED.

---

1. Title XIX, 42 U.S.C. § 1396 *et seq.* (Medicaid).

2. Respondent also argues that waivers of sovereign immunity, like the Vaccine Act, must be narrowly construed and that courts "must resolve textual ambiguity in a statutory waiver in favor of immunity." *Zoltek Corp. v. United States,* 442 F.3d 1345, 1364 (Fed.Cir.2006). The Court does not find the language of 42 U.S.C. § 300aa–15 to be ambiguous and, therefore, does not address Petitioner's sovereign immunity argument.